BOTOROWICZ, by guardian *ad litem,* Respondent, vs. KIECK-
HEFER BOX COMPANY, Appellant.

*March 17—April 9, 1914.*

*Master and servant: Unguarded machinery: Duty to put guard in
place: Practicability for work in question: Questions for jury:
Unwarranted finding of negligence.*

1. In an action for injuries sustained by an employee while mak-
   ing samples upon a creasing machine in a paper-box factory,

a finding by the jury to the effect that it was not the plaintiff's duty, but that of some other employee, to place upon the machine the guard which defendant had provided but which was not in place at the time of the accident, is *held* not to be contrary to such an overwhelming weight of evidence as would justify this court in setting it aside.

2. But the evidence that it was not reasonably practicable to use the machine for making samples with the guard upon it, is *held* to be of such weight and so reinforced by the physical facts and the reasonable probabilities and inferences that it is overwhelming; and a finding of the jury to the effect that defendant was negligent in requiring the plaintiff to use the machine for that purpose without a guard was unwarranted and should be set aside.

APPEAL from a judgment of the circuit court for Milwaukee county: F. C. ESCHWEILER, Circuit Judge. *Reversed.*

Action for personal injuries. The plaintiff, a young man nineteen years of age, was employed in the defendant's box factory for about a year before the accident in question, and for some months had acted as an assistant to the foreman in the paper-box department, his duties being setting the dies in certain so-called creasing machines, making samples, getting the machines ready for the girls, and showing them how to operate them. There were three of the creasing machines, all of the same construction. They consisted of iron tables sixty inches in width and three feet from the floor, in front of which the operator stood. At each side of the table is a standard or round post on which a heavy iron frame, extending across and above the table, worked up and down, carrying a steel die about fifty-eight inches long, which when at rest stood about three inches above the table and when brought down fitted into a female die in the bed of the table, making a crease in the cardboard or paper on the table. The power by which the die was operated was obtained from the shafting by means of a belt at the right side of the machine, and the belt became operative by pressing of the foot of the operator upon a stepper or treadle which extended out in front of the machine near the floor, and which brought into operation an

eccentric cam.   It is not contended that there was any defect in this operation, or that the machine made or could make an unexpected movement of the die.   Two or three weeks before the accident in question the defendant had provided guards for these machines, consisting in each case of a piece of strap iron, three eighths of an inch thick, two and one-half inches wide, and fifty-eight inches in length, which could be fastened to the back part of the table by a bolt at each end, and which when so fastened was immediately in front of and about a quarter of an inch distant from the upper die when brought down, and about five eighths of an inch above the table; in other words, it was between the operator and the die. None of the witnesses had ever seen guards on this kind of a machine before, and the manufacturers of the machines had never provided any.

At the time of the accident the plaintiff was operating one of the machines in making samples for a new job.   In making samples pencil marks have to be made upon the cardboard to be creased and the die brought carefully down upon the pencil marks, and hence it is necessary that the operator should be able to see the pencil marks when he is operating the machine.   This is not necessary when the samples have been made and a gauge provided which automatically regulates the position of the cardboard.   There is very strong evidence to the effect that samples, such as the plaintiff was making when hurt, cannot be made when the guard is on the machine, because it is impossible for the operator to see the pencil marks.   This, however, was denied by the plaintiff and one or two other witnesses on the trial.   In any event the guard was not on the machine, but was lying near by, as the plaintiff knew.   He claims that he never put on or took off a guard on any of the machines, and that it was not his duty, but rather the duty of the machinist, to put the guards on.   The guards were on the other two machines which were not being used for making samples.   It is admitted that it

was necessary to remove the guard whenever the upper die was to be removed and that it was the plaintiff's duty to set the dies.

Just how the accident in question happened is not clear. Upon the trial the plaintiff claimed that the floor was oily and slippery, that he slipped on the floor, that his foot struck the treadle just as he was setting the paper to make a sample,—"I came up against the treadle and I flew in." It is certain that the die came down and cut off his left arm just below the elbow. About two weeks after the accident he made a written statement as to the accident, as follows:

"I do not know how the accident happened. I know it got dark in front of my eyes and I fell into the machine. I never had that happen before. The machine was in perfect condition. It does not repeat. I had run the machine a couple of times a day for a month before the accident. During that month that I ran that machine it never was out of order and it never repeated. That machine cannot repeat because when you push the pedal down a cam comes over and when you let go of the pedal a spring pulls the cam back in place. I often examined the spring and it always worked all right. Your foot could not slip off the pedal because it was corrugated and the corrugations were not worn because the machine was new. The floor in front of the machine was made of hardwood and was not slippery. There was no oil on it and it had no holes in it. When you make a sample box you cannot have a guard on the machine because you got to make pencil marks on the paper where you want to crease it and if the guard was on you could not see the marks.

                                        "JOE BOTOROWICZ.
"I have read that and it is true."

On the trial he was shown this statement, and testified as follows:

"I read it over before I signed it. I knew what the statement was. I understood it when I read it. I knew what I was doing when I signed my name to it—and when I wrote below it, 'I have read that and it is true.' So far as it states the facts they were the truth."

The following special verdict was returned by the jury:

"(1) Was the floor near the foot treadle and in and about the place occupied by the plaintiff while operating the creaser machine just before the accident negligently maintained in such a greasy and oily condition as to be likely to· cause plaintiff to slip in such a way as to be injured when operating said machine?    *A.* No.

"(2) If you answer question 1 'Yes,' was such condition of said floor a proximate cause of plaintiff's injury?    *A.* ——.

"(3) Did defendant negligently require plaintiff to use the creasing machine without a guard upon it, which would prevent plaintiff getting his fingers under the die?    *A.* Yes.

"(4) If you answer question 3 'Yes,' was such failure a proximate cause of plaintiff's injury?    *A.* Yes.

"(5) Did defendant negligently fail to provide proper light at the machine in question which would permit plaintiff to have a fair view of the place where he was required to work and of the parts and appliances of said machine?    *A.* No.

"(6) If you answer question 5 'Yes,' was such failure a proximate· cause of plaintiff's injuries?    *A.* ——.

"(7) Was there any want of ordinary care on the part of the plaintiff which proximately contributed to produce his injuries?    *A.* No.

"(8) What sum would reasonably compensate plaintiff for his injuries?    *A.* Five thousand dollars ($5,000)."

Judgment being rendered for the plaintiff on this verdict, the defendant appeals.

For the appellant there was a brief by *Doe & Ballhorn,* and oral argument by *J. B. Doe.*

For the respondent there was a brief by *Rubin & Zabel,* attorneys, and *Horace B. Walmsley,* of counsel, and oral argument by *Mr. Walmsley.*

WINSLOW, C. J.    In this case an employer who has made the most earnest endeavor to meet every statutory requirement as to safety appliances on the machinery used by employees has been found guilty of actionable negligence and adjudged to pay heavy damages.    It seems from the evidence

that the guards which had been furnished for these machines were devised in the defendant's own shop for the purpose of safeguarding the employees of that shop, and that prior to this time even the manufacturer of the machines had not thought a guard necessary or practicable. In order to sustain the finding of the jury to the effect that the defendant was negligent in requiring the plaintiff to use the machine without a guard, it must appear (1) that it was the duty of some other employee to put the guard on the machine, and (2) that it was reasonably practicable to use the machine for making samples with the guard upon it. If either of these propositions be not supported by credible evidence the conclusion of the jury falls.

As to the first proposition we have had very serious doubt. What seems to be the clear preponderance of the evidence supports the conclusion that it was within the sphere of the plaintiff's own duties to put the guard on the machine when necessary and take it off when necessary. He admits that it was his function to get the machines ready for new jobs, to change the dies when necessary, and that it was necessary to remove the guard when the upper die was changed. To remove or put on the guard it was only necessary to unfasten or refasten two bolts; it could not have been as difficult a task as the task of removing the die. That it was the plaintiff's duty to put on or take off the guard as occasion demanded was testified to by a number of intelligent and disinterested witnesses, and seems far more consistent with the undisputed facts in the case; nevertheless the plaintiff testified positively that it was not his duty, that he had never done it, and further that his immediate superior, the foreman of the department, told him not to put the guard on. We cannot say this evidence is so overwhelmingly overcome by the evidence to the contrary as to justify us in setting aside the conclusion of the jury on this proposition.

As to the second proposition, however, we have reached a different conclusion. The evidence of the superintendent,

the foreman, and the machinist charged with the care of these machines was unanimous to the effect that it was not practicable to have the guard on the machine when samples were being made with large sheets of cardboard, as was admittedly the fact at the time of the accident.  The reason given is very persuasive.  The male die is a long, straight, flat piece of steel, with a knifelike edge, exactly in front of the operator and at right angles with the surface of the table.  When at rest its lower edge is about three inches above the table. When in operation this die moves straight downward until it fits into the female die on the face of the table.  It is necessary in making the samples that the operator should clearly see the edge of the die as it approaches the cardboard, in order that he may adjust the board so that the die will come down exactly on the pencil mark.  The guard is exactly between the operator and the die.  Its lower edge is only five eighths of an inch above the table and its inner surface is only about a quarter of an inch removed from the male die.  Thus the only opportunity for the operator to see the pencil mark on the cardboard is through this space about a quarter of an inch in width by two and one-half inches in depth between the inner surface of the guard and the die, and in order to look through this space the operator must bend forward over the table at the risk of seriously disarranging the cardboard, which (if it be a large sheet, as in the present case) projects beyond the table and is likely to touch the body of the operator as he so bends forward, at the same time using his foot on the treadle.  So the physical fact seems to us to demonstrate the truth of the testimony given by the witnesses named.

It is true that two witnesses testified that samples could be made on the machine without removing the guard, but one of them did not specify whether he meant that a large sample could be made with the guard on the machine, and the other stated that when the samples "got too big I went on a larger

machine." It is also true that the plaintiff testified on the trial that it was not necessary to remove the guard when making a sample box such as he was then making, but he admits that two weeks after the accident he stated in writing that "when you make a sample box you cannot have a guard on the machine, because you got to make pencil marks on the paper where you want to crease it, and if the guard was on you could not see the marks." Upon the trial, when shown this statement, he admits that he read and understood the statement and that "so far as it states the facts they were the truth." Not the slightest claim of overreaching or unfairness or lack of comprehension of the contents of the statement is made.

The trial judge in an opinion written upon the various motions made after judgment said that there was "great confusion" and "inconsistencies" in the plaintiff's testimony. This characterization is mild to the point of euphemism. Careful consideration of the whole case convinces us that the great weight of the testimony is against the finding of the jury on this latter proposition, and that weight is so reinforced by the physical facts and the reasonable probabilities and inferences that it is overwhelming. *Bannon v. Ins. Co. of N. A.* 115 Wis. 250, 91 N. W. 666; *Asserin. v. Modern B. of A.* 147 Wis. 520, 133 N. W. 579.

*By the Court.*—Judgment reversed, and action remanded with directions to enter judgment for the defendant notwithstanding the verdict.